IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ROMALA STONE, INC., ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION |
| ) | |
| v. ) | No. 1:04-CV-02307-WBH |
| ) | |
| HOME DEPOT U.S.A., INC., ) | |
| ) | |
| Defendant. ) | |

## DECLARATION OF FARNOUSH AHADZADEH

COMES NOW Farnoush Ahadzadeh, and pursuant to 28 U.S.C. § 1746 submits the following declaration:

1.

My name is FARNOUSH "FRED" AHADZADEH. I am a resident of Los Angeles, Los Angeles County, California. I am over the age of eighteen (18) years, and I am competent to make this Declaration. This Declaration is based upon my own personal knowledge and is intended to be used for all purposes allowed by law.

1942541v1

1

2.

I am the owner and President of Touchstone Marble & Granite ("Touchstone"). Touchstone's business is the fabrication and installation of custom ordered marble and granite countertops, fireplaces, and other household items.

3.

I established Touchstone in 1995. I have worked in the stone industry since 1986. Over the years, I have fabricated and installed, or supervised the fabrication and installation of, more than 6000 countertops.

4.

When a customer orders a custom granite countertop, the customer informs the fabricator what color granite the customer wants, and the fabricator measures the countertop space to determine how many slabs of granite need to be ordered from the supplier. Granite is purchased from the supplier as slabs exactly as they are shipped from the producing quarry.

5.

The fabricator then fabricates the granite slabs into the sizes needed for the countertop. It is not unusual to have 30-40% waste from fabricating the countertop, due to the unpredictable sizes and shapes of the natural stone. For

example, for 100 square feet of countertop, the fabricator may need to purchase 140 square feet of natural stone to ensure that the fabricator will have enough stone.

6.

Fabricating a natural granite countertop in this fashion is extremely costly. This is due to several factors. First, the equipment required to work with natural granite is very expensive. This is because the tooling must be industrial grade diamond in order to be strong enough to cut the granite. Further, the wear and tear on the equipment requires that some of it be replaced every three to four months, adding to the expense over time.

7.

Also, due to the level of skill required, the labor cost associated with fabricating a natural stone countertop is very high, approximately $15-30 per hour.

8.

Including labor costs, a custom ordered granite countertop or other household product costs approximately $70-80 per square foot, at a minimum.

9.

Generally, it takes a minimum of 10 days to two weeks from the time a customer orders the granite countertop for the countertop to be fabricated and

ready to be installed. This time period can be longer, depending on how heavy the workload is for the custom fabricator.

10.

I first learned of U.S. Patent No. 6,594,973 ("the '973 patent") in the late 1990's. I was introduced to the Romala Stone, Inc. countertops by a builder with the company Paragon Homes who asked that Touchstone install some Romala Stone, Inc. countertops in his assisted living facility.

11.

As a stone fabricator and installer, the '973 patent demonstrates a much less expensive way for the consumer to obtain a natural granite countertop for the home by pre-fabricating the natural granite into the finished product and offering that finished product for sale directly to the consumer at a retail store at a fraction of the cost of custom ordering the same product. Because it is a finished product rather than a slab of granite that needs to be fabricated, the do-it-yourself consumer can install the countertop himself or herself.

12.

As a stone fabricator and installer, it is also conceivable that consumers who may not be inclined to do their own home improvement projects will still purchase the finished product from the retail store and have it installed by someone else,

rather than custom order the product. This will save the consumer both time and a great deal of money.

13.

As a stone fabricator and installer, the "average consumer" referred to and claimed in the '973 patent is someone who purchases items for home improvement projects at a retail store, rather than custom ordering the same or similar products from someone such as myself.

14.

I base that determination on certain discussions contained in the '973 patent. For example, the '973 patent states that the pre-fabricated stone is made available "in high volume stores to the average consumer." (See, Lundin Decl., Ex. A at Col. 2, ll. 34-35). The '973 patent further states that the pre-fabricated stone is packaged and shipped "to high volume stores, such as Home Depot and the like, for high volume sales." (See, Lundin Decl., Ex. A at Col. 2, ll. 50-52). The '973 patent also states that, by pre-fabricating and packaging natural stone for sale in retail outlets, consumers can "buy these stone countertops off the shelf." (See, Lundin Decl., Ex. A at Col. 2, ll. 59-63.) Thus, it is apparent that the "average consumer" is someone who goes to a retail store, such as Home Depot, to purchase home improvement products.

15.

I also base this determination on the discussion in the '973 patent of the cost savings offered to the consumer by making the pre-fabricated product available in retail stores. The '973 patent states that making the pre-fabricated product available in retail stores "brings down the price of the stone to the consumer to very attractive levels, because the cutting of stone today is done by specially trained persons on a custom basis which is very expensive." (See, Lundin Decl., Ex. A at Col. 2, ll. 50-55.) Thus, the phrase "price affordable to an average consumer" refers to the price that the pre-fabricated product is sold for at the retail outlet.

16.

The '973 patent also discusses the time savings to the consumer from being able to purchase the pre-fabricated product at a retail store, as opposed to having to wait for a custom ordered product. For example, the '973 patent states that this offering of a pre-fabricated product creates "an assembly line approach to a product that until now has solely been considered 'a custom-made-to-order product,' that customers would have to wait 6-8 weeks, on average, to have made. Applicants' slabs are designed for the 'do-it-yourself' home improvement market. The slabs can be installed easily by the lay person in less than one hour." (See,

Lundin Decl., Ex. A at Col. 2, l. 64 – Col. 3, l. 3.) Thus, the '973 patent is clearly describing something that offers the consumer both a much lower cost and less time from purchase to installation.

17.

The phrase "suitable for installation by the average consumer" is also consistent with my interpretation of the term "average consumer." By pre-fabricating the natural stone countertop and offering it to the consumer in a retail store, no additional work needs to be done to the countertop before it can be installed in the home. This is most certainly not the case with slabs of granite purchased from a granite supplier, which are direct from the quarry. By purchasing the countertop at a retail store, the "average consumer" does not need to be skilled in the art of granite fabrication, as the countertop has already been fabricated and is a finished product, ready to be installed. Hence, it is suitable for installation by the "average consumer," who is most likely not necessarily skilled in the art of stone fabrication.

18.

As a stone fabricator and installer, the '973 patent is not about offering the consumer a countertop that specifically does not have a sink attached. While the consumer can purchase a countertop with a cutout for a sink (See, Lundin Decl.,

Ex. A at Col. 2, ll. 43-47) and then attach the sink themselves if they so choose (See, Lundin Decl., Ex. A at Col. 4, ll. 58-60), this is clearly not the purpose of the invention. The purpose of the invention is to provide consumers with a much less expensive and less time consuming option for having natural stone countertops in their home.

19.

The purpose of the invention is clear from the '973 patent. For example, the "Objects of the Invention" clearly state that the objects of the invention are to "provide an improved method to package and sell natural stone through high volume stores, such as Home Depot, so that it is available to the average consumer, particularly the do-it-yourself consumer;" "to provide unique packaging for natural stone which protects the stone;" and "to provide a method of selling natural stone to the consumer at prices lower than ever before possible, making it available to the average consumer." (See, Lundin Decl., Ex. A at Col. 2, ll. 16-28). The '973 patent also states that the "cutting, packaging and sale of natural stone, such as marble and granite, in this way, allows, for the first time, the purchase and installation of natural stone, by the do-it-yourself consumer." (See, Lundin Decl., Ex. A at Col. 5, ll. 17-20).

20.

The '973 patent also clearly states that the pre-fabricated product "may, or may not, include cut-outs for sinks of various standard size." (See, Lundin Decl., Ex. A at Col. 2, ll. 43-47.) Thus, the '973 patent also clearly relates to pre-fabricated products that will not have a sink attached at any point, such as a vanity top, before or after purchase by the consumer.

21.

Further, the invention described in the '973 patent would be just as revolutionary if the pre-fabricated product also already had a sink attached to it when it was purchased by the consumer. This is because it would still provide that which had not been seen in my industry prior to the issuance of the '973 patent, which is the offering of a pre-fabricated natural stone product for sale directly to the consumer in a retail store, for immediate installation, at much lower cost than that of a custom ordered, fabricated product.

22.

There are essentially three main ways that an undermount sink can be attached to a natural stone countertop: some type of clip (metal, plastic, etc.), some type of adhesive (epoxy, silicone, etc.), or by routing the underlying plywood and countersinking the sink. There are also various combinations of these methods that

can be used, such as using metal clips and an adhesive or a caulk for additional hold.

23.

As a fabricator and installer, the "fastening means" in the claims of the '973 patent is therefore not limited to just epoxy or other adhesives. Each installer will have his or her preference for what type of "fastening means" he or she uses to attach a sink to a countertop; some may prefer to use epoxy, others may prefer metal clips. The '973 patent discusses the use of epoxy, suggesting that it will be easier for the do-it-yourself consumer to use than metal clips, which are also routinely used to attach a sink to a natural stone countertop. (See, Lundin Decl., Ex. A at Col. 3, ll. 5-12; Col. 4, l. 58 – Col. 5, l. 16.) I have no reason to think that simply because epoxy is considered by the applicants for the '973 patent to be easier for the "average consumer" to use than metal clips, that metal clips could not also be provided with the pre-fabricated countertop. Again, the benefit of this invention to the "average consumer" is the ability of the consumer to purchase a finished, natural stone countertop off the shelf at much less cost than custom ordering the same type of product, not the ability to attach the sink to the countertop using epoxy as opposed to metal clips.

24.

As a fabricator and installer, I also do not read the '973 Patent as being limited to the specific type of packaging that is discussed in the '973 Patent, both in the drawings and at Col. 3, l. 49 through Col. 5, l. 16.  While the packaging is important for the purpose of preventing the countertop from breaking during shipment, I do not see the specific packaging as being necessary to the key object of the invention, which is to provide a pre-fabricated, natural granite countertop to consumers through a retail store.  I might be able to design a different type of package to ship the countertops in, but if I am still providing a pre-fabricated, natural granite countertop to consumers through a retail store, I believe, from my reading of the '973 patent, that I could still infringe the claims of the '973 patent.

25.

The '973 patent also states that the pre-fabricated product is pre-fabricated to a "standard size."  (See, Lundin Decl., Ex. A at Col. 5, ll. 13-16.)  The term "standard size" is understood by someone in my industry as referring to the size or sizes that a product, in this case countertops, can normally be purchased "off the shelf."  The most common standard sizes for countertops are 30 inches, 36 inches and 48 inches in width, but countertops can also be purchased off the shelf in 24 inch and 42 inch widths.  There are also standard depths for countertops; the

standard depth for a bathroom countertop is 21 inches, and the standard depth for a kitchen countertop is 24 inches. This size measurement refers to the width or depth of the cabinet that the countertop will be placed on.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 14, 2005.

_____<br>FARNOUSH AHADZADEH

standard depth for a bathroom countertop is 21 inches, and the standard depth for a kitchen countertop is 24 inches. This size measurement refers to the width or depth of the cabinet that the countertop will be placed on.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 14, 2005.

_____
FARNOUSH AHADZADEH

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ROMALA STONE, INC., ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION |
| ) | |
| v. ) | No. 1:04-CV-02307-WBH |
| ) | |
| HOME DEPOT U.S.A., INC., ) | |
| ) | |
| Defendant. ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2005, I electronically filed the foregoing DECLARATION OF FARNOUSH AHADZADEH with the Clerk of the Court using the CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:

Holmes J. Hawkins, III
hhawkins@kslaw.com

Thomas Charles Lundin, Jr
tlundin@kslaw.com

Letitia A. McDonald
tmcdonald@kslaw.com

Thomas N. Parsekian
parsekianlaw@aol.com

1942541v1                     13

This 14th day of December, 2005.

/s/ Erinn K. Robinson
Erinn K. Robinson
Georgia Bar No. 412702

Co-Counsel for Plaintiff

ARNALL GOLDEN GREGORY LLP
171 17th Street, NW, Suite 2100
Atlanta, Georgia 30363
Telephone: (404) 873-8500
Facsimile: (404) 873-8501
erinn.robinson@agg.com