# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

ROMALA STONE, INC.,

        Plaintiff,

        v.

HOME DEPOT U.S.A., INC.,

        Defendant.

:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION NO.
1:04-CV-02307-RWS

## <u>ORDER</u>

This case is before the Court on Defendant's Motion for Summary Judgment [221], Plaintiff's Motion for Summary Judgment [224], and Defendant's Motion in Limine to Exclude Declaration of Lawrence E. Coffman [244]. After considering the entire record, the Court enters the following Order.

## Background

Plaintiff Romala Stone ("Romala") brought this case alleging breach of contract against Defendant Home Depot. Specifically, Romala has alleged that Home Depot breached its Exclusive Sales Agreement ("ESA") with Romala, by failing to comply with its obligations to market and sell Romala's products in Home Depot's retail stores. The ESA required Home Depot "to carry the

[relevant p]roducts in those Home Depot stores mutually agreed upon by Vendor and Home Depot" and to "promote and market the Products in good faith." This case requires the Court to consider the meaning and enforceability of those principal provisions.

During the time period relevant to this case, Romala and Home Depot entered into at least three contracts. The first was the Vendor Buying Agreement ("VBA"), which incorporated the second contract, the Purchase Order Agreement ("POA"). Romala and Home Depot also entered into a third contract, the Exclusive Sales Agreement ("ESA"), the alleged breach of which is at issue in this case. The ESA states that it is governed by Georgia law. (ESA ¶ 7.) The agreement began the date the ESA was signed, March 29, 2000 and ran three years, unless earlier terminated by Home Depot, at any time, upon ninety days written notice. (ESA ¶ 2.)

The provisions of the ESA at issue relate to Home Depot's obligation, or absence thereof, to sell Romala's products in its retail stores. Paragraph 1, entitled "Exclusivity to Home Depot," provides in pertinent part:

> (a) Vendor agrees and acknowledges that Home Depot has the exclusive right to sell the Products in the contractor/consumer retail market....

2

(b) Home Depot agrees to carry the Products in those Home Depot stores mutually agreed upon by Vendor and Home Depot. Home Depot further agrees to promote and market the Products in good faith in said stores.

(c) The Products shall be sold by Vendor and purchased by Home Depot pursuant to the terms and conditions of the Vendor Buying Agreement entered into by the parties.

(Exclusive Sales Agreement ¶ 1.)

The ESA defined "Products" to mean those described in Exhibit A of the ESA. Exhibit A, entitled "The Products," provides in full:

In-Stock Granite Vanity Tops

| HD Sku # | Part # | Product Description |
|----------|--------|---------------------|
| 583-538 | PG2522 | 25x22 Prelude Granite Vanity Top |
| 583-540 | PG3122 | 31x22 Prelude Granite Vanity Top |
| 583-570 | PG3722 | 37x22 Prelude Granite Vanity Top |
| 583-571 | PG4922 | 49x22 Prelude Granite Vanity Top |
| 652-243 | PG4922N | 49x22 Prelude Granite Vanity Top w/No Cut-Out |
| 648-580 | PG214SS | 21x4 Prelude Granite Sidesplash |
| 648-586 | UV2522 | 25x22 Ubaverde Granite Vanity Top |
| 648-592 | UV3122 | 31x22 Ubaverde Granite Vanity Top |
| 648-644 | UV3722 | 37x22 Ubaverde Granite Vanity Top |
| 648-578 | UV4922 | 49x22 Ubaverde Granite Vanity Top |

AO 72A
(Rev.8/82)

| 651-647 | UV4922N | 49x22 Ubaverde Granite Vanity Top w/No Cut-Out |
|---------|---------|-----------------------------------------------|
| 651-350 | UV214SS | 21x4 Ubaverde Granite Sidesplash |
| 583-541 | SB2522 | 25x22 Speckled Black Granite Vanity Top |
| 583-567 | SB3122 | 31x22 Speckled Black Granite Vanity Top |
| 583-568 | SB3722 | 37x22 Speckled Black Granite Vanity Top |
| 583-535 | SB4922 | 49x22 Speckled Black Granite Vanity Top |
| 651-617 | SB4922N | 49x22 Speckled Black Granite Vanity Top w/No Cut-Out |
| 648-585 | SB214SS | 21x4 Speckled Black Granite Sidesplash |

In an effort to market the Romala product, Home Depot began holding product knowledge courses and invited Romala to their annual road show after the execution of the ESA. (See Def.'s Statement of Undisputed Material Facts ("DSMF") ¶¶ 36-37.) After about one year, Home Depot voiced concerns to Romala about Home Depot's warehousing Romala's products and breakage. (See DSMF ¶ 46.) After raising these concerns, Romala proposed a national rollout of its products in Home Depot stores across the country, which Home Depot declined. (Id. ¶¶ 49, 59.) Still, from 1999 through 2001, the number of Home Depot stores carrying the Romala product increased dramatically and reached its peak with Romala's product being sold in 462 stores total. (See

AO 72A
(Rev.8/82)

Plaintiff's Statement of Material Facts ("PSMF") ¶ 14.)  At the same time,

evidence shows that several Home Depot stores only made one small order

from Romala and never placed another order. (<u>See</u> DSMF ¶ 73.)  It appears that

gradually, beginning in early 2002, Home Depot made the decision to stop

purchasing from Romala and began removing Romala's products from the

shelves of its retail stores. (<u>See</u> PSMF ¶ 20.)  Romala brought this suit, alleging

that Home Depot's failure to carry and promote Romala's products breached

the ESA.

Home Depot moves for summary judgment, contending that it did not

breach the ESA as a matter of law.  In the alternative, Home Depot moves for

partial summary judgment, contending that (1) Romala is not entitled to lost

profits for products not covered by the ESA; (2) Romala's alleged damages are

limited as a result of failure of consideration; and (3) Romala is not entitled to

lost profits for sales allegedly attributable to EXPO stores.  Romala moves for

summary judgment, seeking a court declaration that Home depot breached the

ESA as a matter of law by failing to promote and market the agreed upon

products in good faith.

AO 72A
(Rev.8/82)

**Discussion**

## I.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal quotations omitted)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

AO 72A
(Rev.8/82)

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(c), the

AO 72A
(Rev.8/82)

nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

With these standards as a foundation, the Court turns to address the merits of the parties' motions for summary judgment.

## II.    Parties' Cross Motions for Summary Judgment

In moving for summary judgment, Romala argues that the "plain and unambiguous meaning" of the terms "market" and "carry" in the ESA "clearly demonstrates that, so long as the ESA was in force, Home Depot had an obligation to (1) keep the Romala product in stock on the shelves in those stores where it had agreed to sell the product, and (2) to operate in good faith to drive sales of the Romala product through promoting and marketing the product." (Pl.'s Br. in Support of its Mot. for Summ. J. at 14.)

For its part, Home Depot argues that the ESA required that Home Depot "carry," "promote and market...in good faith" Romala's product only in "stores mutually agreed upon" by Romala and Home Depot. Thus, if Home Depot determined that certain stores would no longer carry the Products, Home Depot no longer "mutually agree[d] upon" those stores, and nothing in the ESA required Home Depot to continue to carry, promote or market the Products in

those stores.  (Def.'s Reply Br. in Support of Def.'s Mot. for Summ. J. at 4-5.)

Home Depot says it did not breach the ESA because "Home Depot was not

required to continue selling product in any amount, or at all, in any particular

Home Depot stores, for any particular period of time" under the ESA, VBA, or

POA.  (Def.'s Memorandum of Law in Supp. of Mot. for Summ. J. at 15.)[1]

Under Georgia law, "[t]he construction of a contract is a question of law

for the court," O.C.G.A. § 13-2-1, and "the construction rules decided by

Georgia courts are applicable in federal court when interpreting a contract

controlled by Georgia law."  In re Club Assoc., 951 F.2d 1223, 1229 (11th Cir.

1992).  Georgia courts apply a three step process when construing contracts.

CareAmerica, Inc. v. S. Care Corp., 229 Ga. App. 878, 494 S.E.2d 720, 722

(1997).  First, the court must determine whether the language of the contract is

---

[1]Home Depot relies, in part, on U.S. Faucets, Inc. V. Home Depot
U.S.A., Inc., No. 1:03-CV-1572, 2006 WL 1518887, at *2 (N.D. Ga. May 31,
2006), for the proposition that Home Depot had no continuing obligation to
carry Romala products.  In that case, Home Depot and a different vendor
entered into contracts that were materially identical to the VBA and POA at
issue in this case, but not the ESA.  In that case, the court concluded that
"[n]either the VBA nor the POA required Home Depot to purchase, or once
purchasing commenced, to continue purchasing products from [the vendor]."
Id.

AO 72A
(Rev.8/82)

clear and unambiguous.  Id.  Where the language of a contract is clear,

unambiguous, and capable of only one reasonable interpretation, no

construction is necessary, and the court simply enforces the contract according

to its clear terms.  Id.; Club Assocs., 951 F.2d at 1230.  If, however, a word or

phrase in the contract is ambiguous, then the court must proceed to the second

step and apply the rules of contract construction to resolve the ambiguity.

CareAmerica, 494 S.E.2d at 722. Finally, "if the ambiguity remains after

applying the rules of construction, the issue of what the ambiguous language

means and what the parties intended must be resolved by a jury."  Id.

Before endeavoring to interpret the terms of a contract, however, the

Court must determine that it is enforceable and sufficiently definite so as to be

capable of interpretation.  As an initial matter, to be enforceable, a contract

must be based upon mutuality of consideration.  It is axiomatic that contracts

that lack mutuality are unenforceable.  See Billings Cottonseed, Inc. v. Albany

Oil Mill, Inc., 173 Ga.App. 825, 328 S.E.2d 426, 428 (1985).

Second, under Georgia law, "[a] promise must be sufficiently definite as

to both time and subject matter to be enforceable."  Hunt v. Thomas, No.

A08A2142, 2009 WL 580448, at *3 (Ga. Ct. App. Mar. 9, 2009).  Therefore,

"agreements to agree," which leave essential terms for subsequent negotiation,

are not enforceable. "It is well established that 'no contract exists until all

essential terms have been agreed to, and the failure to agree to even one

essential term means that there is no agreement to be enforced.' " <u>Kreimer v.

Kreimer</u>, 274 Ga. 359, 552 S.E.2d 826, 829 (2001) (quoting <u>Moss v. Moss</u>, 265

Ga. 802, 463 S.E.2d 9 (1995)). As the Georgia Supreme Court has held:

> If a contract fails to establish an essential term, and
> leaves the settling of that term to be agreed upon later
> by the parties to the contract, the contract is deemed
> an unenforceable "agreement to agree."

<u>Id.</u>; <u>see also</u> <u>Miami Heights LT, LLC v. Home Depot U.S.A., Inc.</u>, 283 Ga.App.

779, 643 S.E.2d 1, 3 (2007) (same); <u>Hartrampf v. Citizens & S. Realty

Investors</u>, 157 Ga. App. 879, 278 S.E.2d 750, 752 (1981) (unless agreement

leaves nothing to future negotiations it is unenforceable); <u>Nuclear Assurance

Corp. v. Dames & Moore</u>, 137 Ga. App. 688, 225 S.E.2d 97, 98 (1976)

(agreements to negotiate in future are not binding); <u>Malone Constr. Co. v.

Westbrook</u>, 127 Ga. App. 709, 194 S.E.2d 619, 620 (1972) (same); <u>Russell v.

City of Atlanta</u>, 103 Ga. App. 365, 119 S.E.2d 143, 144 (1961) (same);

<u>American Viking Contractors v. Scribner Equip. Co.</u>, 745 F.2d 1365, 1369-70

(11th Cir.1984) (in Georgia, unless all terms and conditions are agreed upon, no binding obligation arises); Gardner v. Marcum, 292 Ga.App. 369, 665 S.E.2d 336, 338-39 (2008) (finding an unenforceable agreement to agree where parties to a music contract never agreed on the investors rate of return or whether an unsecured loan or equity investment would be used). That being said, "deferral of agreement on a nonessential term does not invalidate an otherwise valid contract." Goobich v. Waters, 283 Ga.App. 53, 640 S.E.2d 606, 609 (2006).

The Court finds that the enforceability of the ESA must be analyzed in two separate respects. First, the Court must determine Home Depot's obligation to continue buying products from Romala. Second, the Court must determine Home Depot's obligations relative to products actually purchased from Romala.

Applying these well-settled rules of contract law, it is clear that the ESA fails for both a lack of mutuality and for indefiniteness as it relates to Home Depot's obligation to continue buying products from Romala. First, the ESA imposes no affirmative obligation on the part of Home Depot to purchase anything from Romala, even though Romala is required under the contract to sell certain products exclusively to Home Depot. In other words, because the

contract only requires Home Depot to market and sell products in the circumstance that it mutually agrees to do so, Home Depot has offered no consideration in exchange for Romala's promise to sell exclusively to Home Depot.

Second, even assuming, as Romala argues, that the provision of the ESA requiring Home Depot to carry Romala's products in "stores mutually agreed upon" imposes an affirmative obligation upon Home Depot to continue to carry certain products in a certain number of stores, the contract fails for indefiniteness because the contract provides no guideposts for ascertaining the essential terms of the agreement. The Court cannot determine, from the existing contract, the parameters of Home Depot's obligation to market and sell Romala's product without imposing an arbitrary meaning. For example, it is unclear from the agreement whether the parties had a meeting of the minds on the essential question of the minimum number of products to be sold by Home Depot, the minimum number of stores to sell product, which stores would sell the product, or the procedure for determining under the contact which stores will sell which products.

Georgia cases make clear that the lack of mutuality and the indefinite terms at issue constrain the Court to conclude that the ESA is unenforceable. In Wedgewood Carpet Mills, Wedgewood, a carpet manufacturer in Dalton entered into a contract with Color-Set, a wool dyer who had a patented process for dying wool to carry fifteen of Color-Set's colors. Wedgewood Carpet Mills, Inc. v. Color-Set, Inc., 149 Ga. App. 417, 254 S.E.2d 421, 422 (1979). Color-Set was to furnish the dyed yarn in these colors to no one except Wedgewood. In exchange, Wedgewood was to buy all the yarn for a particular carpet line from Color-Set. Id.

The court in that case found that the contract between Wedgewood and Color-Set was unenforceable, "as to any unperformed portion of the agreement provided that so long as Wedgewood wanted to purchase yarn, in any amount and at unstated prices, Color-Set was not only obligated to sell yarn to Wedgewood but that it could not sell similar yarn to any customer for the period of one year at any price at any location. The agreement did not require Wedgewood to make any purchase at all." Id. at 423 (1979). Like the agreement held unenforceable in Wedgewood, so long as Home Depot wanted to purchase Romala's products, in any amount and at unstated prices, Romala

14

was obligated to sell to Home Depot and could not sell its products to others for the term of the three-year contract. Thus, like the contract in <u>Wedgewood</u>, the ESA is unenforceable for lack of mutuality for the complete lack of a requirement on the part of Home Depot to make any purchase at all. In fact, in <u>Wedgewood</u>, the buyer agreed to be restricted from purchasing a similar line of products from others, unlike Home Depot in this case. Nevertheless, that mutual restriction was not enough for the court in <u>Wedgewood</u> to conclude that the agreement provided mutuality, because the buyer still was under no obligation to purchase any product from the seller. Likewise, in this case, there is nothing in the ESA that imposed an obligation on Home Depot to purchase any quantity of goods. In this respect, the purported agreement was unilateral, and therefore, unenforceable for want of mutuality. Also, the fact that Home Depot occasionally purchased products from Romala did not convert the ESA into a bilateral, mutual contractual obligation. "The fact that quantities from time to time were purchased by Wedgewood from Color-Set did not convert the agreement into a bilateral contractual obligation in the future, because such purchases still did not obligate Wedgewood to the purchase of any definite quantities." <u>Id.</u> at 424 (internal citations omitted).

AO 72A
(Rev.8/82)

Lastly, the contract in <u>Wedgewood</u> failed for indefiniteness because "[t]here was no agreement in specific detail as to the quantity of yarn, the terms and amount of credit or when or where the goods were to be delivered." <u>Id.</u> at 424. Likewise, in this case there were not details in the agreement as to the quantity of products to be sold, how often they were to be purchased and the like. For the same reasons the Georgia Court of Appeals refused to enforce the agreement in <u>Wedgewood</u>, this Court concludes that the contract is too unilateral and indefinite to be capable of enforcement.

Moreover, in <u>Drug Line, Inc.</u>, the court also found that the contract executed failed for lack of mutuality and indefiniteness. Drug Line and Sero-Immuno Diagnostics, Inc. ("SID") entered into an agreement by which Drug Line acquired distribution rights of a new HIV test kit developed by SID. The contract stated that Drug Line desired to obtain the exclusive worldwide rights to purchase, market and distribute the HIV test kits; that "upon receipt of $100,000 ... [SID] will use the funds to upgrade the facilities in order to provide HIV 1 and HIV 2 test kits in amount necessary to meet future obligations"; that "upon the delivery of orders" by Drug Line for 100,000 kits per year of the Aids Kit at a price of $3,700,000, SID "will continue to grant to [Drug Line] the

AO 72A
(Rev.8/82)

Exclusive Worldwide Rights for purchasing marketing and distributing the Aids

Test Kits"; and that "[SID] and [Drug Line] agree to execute another agreement

. . . within approximately thirty (30) days . . . ." Drug Line, Inc. v.

Sero-Immuno Diagnostics, Inc., 217 Ga. App. 530, 458 S.E.2d 170, 170 (1995).

The court stated in Drug Line, that while there is a "gap filler" provision

in O.C.G.A. § 11-2-204(3), there still must be a "reasonably certain basis for

giving an appropriate remedy." Id. at 171 (1995). Thus, the court did not read

the gap filler provision to obliterate the common law rule that the first

requirement of law of a valid contract is that "there be a meeting of the minds of

the parties and mutuality, and the agreement must be expressed plainly and

explicitly enough to show what the parties agree upon." Id. The court went on

to say that an "agreement which is entirely subject to conjecture cannot be

enforced. This is true when the contract is construed under Georgia's

Commercial Code or common law, or whether it be a sales or distribution

agreement, or a requirements or output contract." Id.

In that case, Drug Line sought to tie up the exclusive world rights to the

kits without actually having to buy or distribute a single kit. The agreement

would have in perpetuity restrained SID from manufacturing and selling more

17

than 100,000 kits at any price, and those never for more than $37 per kit." Id.
For that reason, the court concluded it was unenforceable.

Likewise, in this case there was no mutuality. Like Drug Line, Home
Depot was not actually required by the ESA to carry the products in any of its
retail stores. It is not clear what the parties agreed upon because, like Drug
Line, where the parties agreed to execute another contract within thirty days,
Home Depot and Romala agreed to "mutually agree" at a later time upon which
stores would carry Romala's products.

The court is mindful that "the policy of the law is against the destruction
of contracts on the ground of uncertainty if it is possible in the light of the
circumstances under which the contract was made to determine the reasonable
intention of the parties." Miami Heights LT, LLC v. Home Depot U.S.A., Inc.,
283 Ga. App. 779, 643 S.E.2d 1, 4 (2007). However, the complete lack of any
mutuality and guidance in the contract on the essential questions of whether,
when, how many, where, and which products would be sold renders the contract
incapable of interpretation. Therefore, the Court concludes that the ESA is
unenforceable as to any unperformed portions of the agreement.

18

While the Court finds that the ESA is unenforceable as to any unperformed portion of the agreement, this finding does not mean that Home Depot had no duty to Romala whatsoever. Once Home Depot agreed with Romala to place products in a particular store and ordered products for that store, Home Depot had a duty to "promote and market the Products in good faith in said stores." (ESA ¶ 1(b).) In <u>Sealtest Southern Dairies Division v. Evans,</u> the court found a contract between a milk seller and milk buyer to be unilateral. 103 Ga. App. 835, 120 S. E. 2d 887, 889-90 (1961). Still, the court in that case held that "as to the past performance, an action would lie, but not for a breach as to the future performance, since in this case there was no binding obligation upon the defendant for future purchases . . .[w]hile the contract was unilateral and, therefore, unenforceable as to future performances, the plaintiff clearly is entitled to recover for deliveries made under the contract prior to the plaintiff's refusal to make future deliveries." <u>Id.</u>

Likewise, in 2002, when "Home Depot not only abruptly stopped trying to increase sales of the Romala product, but unilaterally pulled it off the shelves and replaced it with other, similar products . . . ", (Pl.'s Br. in Support of its Mot. for Summ. J. at 17.) Home Depot may have breached the ESA's

19

requirement to "promote and market the Products in good faith." (ESA at ¶ 1(b).) There is currently insufficient evidence in the record for the Court to make a determination as to whether Home Depot violated the agreement by failing to "promote and market the Products in good faith."

Thus, the Court concludes that Romala's claim for Home Depot's failure to promote and market in good faith those products actually ordered by Home Depot remains in the case. In their motions, the parties have also raised the issue of whether the agreement extends to sales to EXPO stores and to products not actually listed in Exhibit A to the ESA. In support of its position, Romala submitted the Declaration of Lawrence E. Coffman [235]. Home Depot filed a Motion in Limine to Exclude the Declaration [244]. After due consideration, Home Depot's Motion [244] is **DENIED**. To the extent the declaration includes probative evidence, the Court has considered it.

Having considered the entire record, the Court finds that the ESA is clear and unambiguous in its limitation to products specifically listed in Exhibit to the ESA. However, the Court does not find that there is a limitation that excludes sales to EXPO stores. Thus, Romala's claim is limited to products

ordered by Home Depot for any of its store, including EXPO stores, that are included in the list at Exhibit A to the ESA.

## Conclusion

For the reasons stated herein, Defendant's Motion for Summary Judgment [221] is hereby **GRANTED, in part** and **DENIED, in part**, and Plaintiff's Motion for Summary Judgment [224] is hereby **DENIED**. Defendant's Motion in Limine to Exclude the Declaration of Lawrence E. Coffman [244] is **DENIED**.

**SO ORDERED**, this   30th   day of March, 2009.


**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)